UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANTHONY SAMUEL TOTA,

                Plaintiff,

v.                              **DECISION AND ORDER**
                                    06-CV-514S

DAVID W. BENTLEY, et al.

                Defendants.

## I. INTRODUCTION

Plaintiff commenced this action under 42 U.S.C. § 1983 on July 31, 2006, alleging that officers from the Chautauqua County Sheriff's and Jamestown Police Departments used excessive force against him in violation of his Fourth Amendment rights. Presently before this Court are Defendants' Motion for Summary Judgment (Docket No. 149)[1] and Plaintiff's multiple motions for contempt and default judgment (Docket Nos. 164, 166, 167, 169).[2]

---

[1] Submissions relating to Defendants' motion are at docket numbers 149-153 and 155-162.

[2] Submissions relating to Plaintiff's motions are at docket numbers 163-170.

## II. BACKGROUND

**A.    Facts**

   **1.    The Incident Giving Rise to Plaintiff's Arrest**

On August 3, 2003, firefighters responded to a report of a house fire at 48 Sherman Street, in Jamestown, N.Y.  (Affidavit of David Bentley, Docket No. 149, ¶¶ 3–4.)  When firefighters entered the house, they were confronted by Plaintiff, who was holding a shotgun. (Bentley Aff., ¶ 4.)  The firefighters left immediately. (Bentley Aff., ¶ 4.)

After the firefighters left, Plaintiff fired the shotgun at a Jamestown Fire Department truck, piercing it with a deer slug.  (Bentley Aff., ¶ 4.)  Thereafter, Plaintiff's immediate neighbor and cousin, Thomas Gelbato, arrived at the scene and observed Plaintiff's arm in an upstairs bedroom window.  (Affidavit of Daryl P. Brautigam, Docket No. 149, Exhibit A, p. 2.[3])  He next heard broken glass, smelled gasoline, and saw that his garage was on fire.  (Brautigam Aff., Exhibit A, p. 2.)  Plaintiff apparently threw a flammable mixture at Gelbato's garage.  (Brautigam Aff., Exhibit A, p. 2.)

The Jamestown Police Department then responded to the scene.  (Bentley Aff., ¶ 5.)  Unable to communicate with Plaintiff, Jamestown police officers called in the Chautauqua County Sheriff's Department SWAT team to assist.  (Bentley Aff., ¶ 5.)  The SWAT team arrived and attempted to communicate with Plaintiff for approximately nine hours before entering the house at 4:30 a.m., on August 4, 2003. (Bentley Aff., ¶ 6.) Upon entering, SWAT officers were confronted by Plaintiff, who was brandishing a tire iron.

---

[3] Exhibits to the Brautigam Affidavit are filed at Docket No. 151.

(Bentley Aff., ¶ 7.)  SWAT officers subdued and arrested Plaintiff.[4]  (Bentley Aff., ¶ 7.)

Plaintiff denies any independent knowledge or recollection of the events of August 3, 2003, leading up to his arrest.  (Brautigam Aff., Exhibit E, pp. 36, 39-40, 42-45, 49.)  Rather, Plaintiff insists that he learned the details of these events only through the various reports he received after his arrest.  (Brautigam Aff., Exhibit E, pp. 36, 39-40, 42-45, 49.)  Plaintiff claims that he did nothing to damage his house or any surrounding houses.  (Brautigam Aff., Exhibit E, p. 30.)  He denies setting fire to his house, and denies knowing that his front porch was on fire.  (Brautigam Aff., Exhibit E, pp. 30, 32-33.)  Plaintiff admits that he pled guilty to an arson charge for setting fire to his cousin's garage,[5] but states that he did not actually cause the fire and pled guilty only to avoid being sent to the Rochester Psychiatric Center.[6]  (Brautigam Aff., Exhibit E, pp. 31-32.)  Plaintiff insists that his independent recollection does not begin until the point of his arrest.

---

[4]Details of this incident are also recounted in the various police reports filed in support of Defendants' Motion for Summary Judgment.  See Brautigam Aff., Exhibit A.

[5]Plaintiff initially pled guilty to felony arson in the 3rd degree in Chautauqua County Court. (Brautigam Aff., Exhibit C.)  At no time during the lengthy plea discussions did Plaintiff assert that officers used excessive force in effectuating his arrest. (Brautigam Aff., Exhibit C.)  The court placed Plaintiff on interim probation for one year.  Because Plaintiff was compliant with the terms of his probation, which included mental health treatment, he was permitted to withdraw his felony guilty plea and plead to arson in the 5th degree, a misdemeanor. (Brautigam Aff., Exhibits C and D.)

[6]Plaintiff has a history of mental health problems.  He was hospitalized at mental health institutions from 1989-1990, 1991-1993, 1994, and for nine weeks in 2001.  (Brautigam Aff., Exhibit E, pp. 15-17.)  From 1989 through 1999, Plaintiff received Social Security disability benefits due to a "psychological disability."  (Brautigam Aff., Exhibit E, p. 21.)  Between August 4, 2003, and November of 2005, Plaintiff was either incarcerated at the Chautauqua County jail or hospitalized at the Rochester Psychiatric Center in Rochester, N.Y.  (Brautigam Aff., Exhibit E, pp. 9-12.)

## 2. Plaintiff's Version of His Arrest

Plaintiff's recollection of his arrest is as follows: He was sitting at home, unarmed, perhaps sleeping in his kitchen, when he heard a loud noise and people breaking into his house. (Brautigam Aff., Exhibit E, pp. 40-41.) Someone fired a weapon at him, so he ran into the living room, where he was tackled, beaten with billy clubs, and punched and kicked by a group of officers. (Brautigam Aff., Exhibit E, pp. 50-51, 52, 53, 55.) He fell face down on the floor and was unable to move because officers were on his back. (Brautigam Aff., Exhibit E, p. 55.)

When Plaintiff tried to turn his head and speak, a standing officer kicked him in his right eye. (Brautigam Aff., Exhibit E, pp. 55-56.) Another officer stood on his lower back, with both feet together, and jumped up and down, allegedly fracturing his vertebra. (Brautigam Aff., Exhibit E, pp. 56-57.) A third officer kicked Plaintiff in his right shoulder. (Brautigam Aff., Exhibit E, p. 62.) After that blow, an officer on Plaintiff's back twice choked him to the point of almost losing consciousness. (Brautigam Aff., Exhibit E, p. 62.) Plaintiff states that he was then pepper-sprayed in each eye from a distance of less than an inch, and then twice electrocuted by officers using a "shorted-out electric cord" that "was emitting electricity under the floor." (Brautigam Aff., Exhibit E, pp. 63.) After that, Plaintiff was handcuffed behind his back, and pulled out of the house "with such force that [he was] lifted vertically off the ground without [his] knees touching."[7] (Brautigam Aff., Exhibit E, p. 64.) On his way out of the house, an officer elbowed Plaintiff in the stomach and smiled at him. (Brautigam Aff., Exhibit E, p. 65.)

---

[7] Plaintiff is 5' 9" and weighs 180 pounds. (Brautigam Aff., Exhibit A, p.4.)

Plaintiff maintains that this treatment continued on his front lawn. He testified that he was thrown to the ground, and again kicked, punched, and beaten with billy clubs over his entire body. (Brautigam Aff., Exhibit E, p. 65.) He contends that while he was face-down in the grass, an officer stood on his calves, one foot on each calf, and jumped up and down. (Brautigam Aff., Exhibit E, p. 65.) Finally, officers picked Plaintiff up off the ground, took him to a police car, slammed his face into the hood of the car, and then drove him to the Jamestown Police Department. (Brautigam Aff., Exhibit E, pp. 36, 39-40.)

### 3. Defendants' Version of Plaintiff's Arrest

Defendants' account of Plaintiff's arrest differs substantially. Defendants deny using excessive force or causing Plaintiff any injury. (Bentley Aff., ¶ 7.) Defendants maintain that the only force used was that necessary to remove the tire iron from Plaintiff and subdue him. (Bentley Aff., ¶ 7.) Beyond that, Defendants maintain that no one struck or abused Plaintiff in any way. (Bentley Aff., ¶¶ 7, 9.) Vincent Capizzi, a Jamestown firefighter, testified at his deposition that he was present at the scene and did not see any of the events that Plaintiff complains of, particularly the beating on the front lawn. (Brautigam Aff., Exhibit S, pp. 38-40.)

### 4. Post-Arrest Events and Evidence of Plaintiff's Injuries

Plaintiff testified that the beating he endured left him with welts on the top of his head from being hit with multiple billy clubs, bruises on his thighs, and broken or sore ribs. (Brautigam Aff., Exhibit E, pp. 55, 65.) Plaintiff maintains that he complained to officers

5

at the Jamestown Police Department that he was in "terrific pain" and needed hospitalization. (Brautigam Aff., Exhibit E, p. 66.) But according to Defendant Bentley, Plaintiff did not complain of any injuries after his arrest and did not have any apparent injuries. (Bentley Aff., ¶ 10.)

Later on the day of his arrest (August 4, 2003), Plaintiff was taken to the Chautauqua County Correctional Facility. (Brautigam Aff., Exhibit B.) The booking report, completed approximately ten hours after Plaintiff's arrest, indicates that Plaintiff was "alert and oriented" and that the booking officer observed no "signs of injury or pain, or need for immediate medical assistance." (Brautigam Aff., Exhibit B.) It also indicates that, in the booking officer's opinion, Plaintiff did not appear agitated, withdrawn, or sick, and was able to ambulate without assistance. (Brautigam Aff., Exhibit B.)

The booking form also required Plaintiff to answer health screening questions. In that section, Plaintiff indicated that he did not sustain any injuries during his arrest and was not currently in need of medical attention. (Brautigam Aff., Exhibit B.) Moreover, Plaintiff indicated that he was currently receiving treatment for medical conditions involving his shoulder, back, and knee. (Brautigam Aff., Exhibit B.) In the "medical history" section of the form, there is an indication of headaches, left shoulder injury, and right thumb injury. (Brautigam Aff., Exhibit B.)

Plaintiff contends that the officers permanently injured his back, right eye, and right shoulder. (Brautigam Aff., Exhibit E, p. 90.) Plaintiff admits, however, that he had some preexisting injuries. He suffered multiple injuries, including a lumbar injury, in an

6

automobile accident in 2001,[8] and had eye problems, including blurred vision and possible detached retina, since 2000. (Brautigam Aff., Exhibit E, pp. 72, 80-81; Exhibit J, p. 2.) Moreover, Plaintiff's right shoulder was diagnosed as "normal" on May 20, 2004, less than one year after the alleged incident. (Brautigam Aff., Exhibit K.)

**B.     Procedural History**

Plaintiff commenced this action on July 31, 2006. (Docket No. 1.) He filed an Amended Complaint on December 3, 2007. (Docket No. 94.) Defendants filed the instant Motion for Summary Judgment on December 2, 2008. (Docket No. 149.) Plaintiff filed motions for contempt and default judgment in February and March 2009, after the conclusion of briefing on Defendants' Motion for Summary Judgment. (Docket Nos. 164, 166, 167, 169.) This Court took the motions under advisement without oral argument.

## III.  DISCUSSION

Cognizant of the distinct disadvantage that pro se litigants face, federal courts routinely read their submissions liberally, and interpret them to raise the strongest arguments that they suggest. See Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). This is especially important when reviewing pro se complaints alleging civil rights violations. See

---

[8] Three years after the alleged incident, Plaintiff was diagnosed with an "old" fractured vertebra in his lumbar area and was given a back brace. (Brautigam Aff., Exhibit E, pp. 67-69.) Plaintiff did not, however, report to his physician any injury arising from his arrest in 2003. (Brautigam Aff., Exhibit E, pp. 72-73.) Rather, Plaintiff attributed his back pain to his 2001 automobile accident. (Brautigam Aff., Exhibit E, p. 72.)

7

Weinstein v. Albright, 261 F.3d 127, 132 (2d Cir. 2001). Since Plaintiff is proceeding pro se, this Court has considered his submissions and arguments accordingly.

A.  **Defendants' Motion for Summary Judgment**[9]

   1.  **Summary Judgment Standard**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.

---

[9]Plaintiff initially requests that Defendants' motion be denied as untimely, for insufficient service, for failure to include the required notice to pro se litigants, and for failure to file a Rule 56.1 Statement of Undisputed Facts. (See Docket Nos. 155, 157.) Having reviewed the record and motion papers, this Court finds that Defendants' motion is timely, that service was properly attempted and eventually made on Plaintiff without prejudice to him (Docket No. 153), and that, although Defendants failed to file the required pro se litigant notice and Rule 56.1 statement, Plaintiff was not prejudiced by this failure. Defendants eventually filed their Rule 56.1 statement (Docket No. 160), which was drawn from the affidavits Plaintiff received with Defendants' initial motion papers. In addition, Plaintiff has proceeded pro se in at least three cases before this Court, all of which involved motions for summary judgment. Plaintiff is therefore familiar with motions under Rule 56. Accordingly, this Court finds that Plaintiff was not prejudiced by Defendants' inadvertent failures.

1991).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment.  Anderson, 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998).  That is, there must be evidence from which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 252.

Despite the general admonition that courts must not weigh evidence or engage in credibility findings at the summary judgment stage, the Second Circuit recognizes that "in rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account."  Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (internal citation omitted).  Under such circumstances, the defendant must nonetheless demonstrate that there is no evidence in the record upon which a reasonable factfinder could return a verdict in the plaintiff's favor.  Id.

## 2. Section 1983: Fourth Amendment Claim

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393-94,109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged. See Baker, 443 U.S. at 140. Here, Plaintiff's § 1983 claim is that officers used excessive force against him in violation of his Fourth Amendment rights.

The Fourth Amendment is applicable to the States by way of the Fourteenth Amendment. Minnesota v. Dickerson, 508 U.S. 366, 372, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993). The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. Fourth Amendment excessive force claims are analyzed under a standard of objective reasonableness. Graham, 490 U.S. at 394. This requires the court to "'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" Garner, 471 U.S. at 8 (quoting United States v. Place, 462 U.S. 696, 703, 103 S. Ct. 2637, 2642, 77 L. Ed. 2d 110 (1983)).

In determining whether an officer's actions were reasonable, the actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,'. . . violates the Fourth Amendment." Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). The facts and circumstances of each case must be considered carefully, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (citing Garner, 471 U.S. at 8-9).

An officer is justified in using force when a person whom he is trying to arrest resists, threatens, or assaults the officer. Sullivan v. Gagnier, 225 F.3d 161, 165-66 (2d Cir. 2000). However, "[t]he force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." Id.

### 3. Analysis

As stated above, Plaintiff alleges that Defendants used excessive force in effectuating his arrest. Mindful that the evidence must be considered in the light most favorable to Plaintiff, this Court nonetheless finds that Plaintiff has failed to present sufficient evidence from which a jury could reasonably conclude that Defendants used excessive force against him in violation of the Fourth Amendment.

This Court finds that this is one of the "rare circumstances" where the outlandish and unsubstantiated nature of Plaintiff's account makes summary judgment in Defendants'

favor appropriate. See Jeffreys, 426 F.3d at 554. According to Plaintiff, he has no recollection of his house being on fire, of throwing a flammable mixture at his cousin's garage, or of his nine-hour stand-off with law enforcement. He does not recall confronting firefighters with a shotgun, firing at the Jamestown fire truck, or approaching the SWAT team with a tire iron.

Inexplicably, however, Plaintiff recalls the circumstances of his arrest. But the beatings and electrocution he claims to have endured are completely at odds with both his conduct after his arrest, and the objective evidence of record. Plaintiff claims that SWAT officer shot at him, beat him with clubs, kicked him, punched him, elbowed him, choked him, pepper-sprayed him, jumped up and down on his back and calves, slammed his face into a patrol car, and twice electrocuted him. Plaintiff states that he had welts on his head, bruises on his thighs, broken ribs, and permanent injuries to his back, right eye, and right shoulder.

No witness and no evidence corroborates Plaintiff's rather fantastical claims. Just hours after this alleged incident, Plaintiff was alert and oriented, had no signs of injury or pain, and had no need for immediate medical assistance. (Brautigam Aff., Exhibit B.) He did not appear agitated, withdrawn, or sick, and was able to move around without assistance. (Brautigam Aff., Exhibit B.) Plaintiff himself denied sustaining any injuries during his arrest and denied needing medical attention. (Brautigam Aff., Exhibit B.) Plaintiff never referenced any beating or excessive force during his plea or sentencing in the Chautauqua County Court. (Brautigam Aff., Exhibits C and D.)

Moreover, the only evidence discussing any injury to Plaintiff corroborates Defendants' version of events, not Plaintiff's. A medical record from the Chautauqua

12

County jail indicates a diagnosis on August 5, 2003, of "pain [from] altercation," for which Plaintiff was given Aleve, and unspecified "multiple contusions," for which no treatment was indicated. (Plaintiff's Appendix to Rule 56.1 Statement, Docket No. 157, Exhibit E, p. 1.) Notes from August 12 and 26, 2003, indicate Plaintiff was again given Aleve and Tylenol for low back pain and back strain. (Plaintiff's Appendix, Exhibit E, p. 2.)

These records, are wholly inconsistent with the severe beatings that Plaintiff alleges he suffered. It strains all credulity to believe that, if Plaintiff was beaten with billy clubs, punched and kicked, electrocuted, and stomped on, immediate and extensive medical attention would not be required. Rather, these records are entirely consistent with the circumstances of Plaintiff's arrest as Defendants set them forth: Defendants concede that Plaintiff may have been "jostled, bumped and struck while he was being subdued." (Bentley Aff., ¶ 7.) After a nine-hour standoff, during which Plaintiff shot at a fire truck and threw a flammable mixture out of the house, it was reasonable for officers to conclude that Plaintiff was dangerous and that some level of force would be required to subdue him. As it turned out, SWAT officers had to disarm Plaintiff of the tire iron and get him to the ground to effectuate his arrest. Some contusions and pain is therefore reasonably expected. See Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (officers' actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,'. . . violates the Fourth Amendment")

Further, the evidence of record demonstrates that the injuries Plaintiff claims to have suffered to his back, right eye, and right shoulder all predate his arrest. Plaintiff suffered

13

multiple injuries, including a lumbar injury, in an automobile accident in 2001, and had eye problems, including blurred vision and possible detached retina, since 2000.[10] (Brautigam Aff., Exhibit E, pp. 72, 80-81; Exhibit J, p. 2.)  Moreover, Plaintiff's right shoulder was diagnosed as "normal" on May 20, 2004, less than one year after the alleged incident. (Brautigam Aff., Exhibit K.)

Based on the evidence of record, this Court finds that no reasonable jury could conclude that Defendants' actions were objectively unreasonable, and that Defendants used excessive force on Plaintiff in violation of the Fourth Amendment.  Plaintiff's testimony is unsubstantiated by any direct evidence, and is so far-fetched that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." Jeffreys, 426 F.3d at 555 (upholding summary judgment where the plaintiff relied solely on his own uncorroborated, inconsistent, and improbable testimony, which was inconsistent with the medical evidence); see also Aziz Zarif Shabazz v. Pico, 994 F.Supp. 460, 468-71 (S.D.N.Y. 1998) ("when the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court may] pierce the veil of the complaint's factual allegations . . . and dismiss the claim"); Schmidt v. Tremmel, No. 93 CIV 8588, 1995 WL 6250 (S.D.N.Y. Jan. 6, 1995); Price v. Worldvision Enters., Inc., 455 F.Supp. 252, 266 n.25 (S.D.N.Y 1978) ("issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds").  Therefore, Defendants' Motion for Summary Judgment will be

---

[10] An entry from August 8, 2003, indicates a referral to an eye surgeon for "flashing lights" and "sudden visual decrease."  (Plaintiff's Appendix, Exhibit E, p. 2.)  But evidence from Plaintiff's eye doctor indicates that Plaintiff was complaining of "peripheral flashing lights in his right eye since 1999.  (Plaintiff's Appendix, Exhibit G, p. 2.)  This is therefore not attributable to the alleged use of excessive force.

granted.

**B.      Plaintiff's Motions for Contempt and Default Judgment**

Plaintiff filed two motions to hold Defendant's attorney, Daryl Brautigam, in contempt for allegedly disclosing Plaintiff's psychiatric records in violation of a protective order entered in this case by the magistrate judge. (Docket Nos. 164, 167.) The magistrate judge's order, upon which Plaintiff relies, denied Defendants' motion to compel Plaintiff to produce psychological or psychiatric records and relieved Plaintiff of having to disclose his psychological records. (Docket No. 109.) Plaintiff's mental state is relevant in this litigation, however, and this Court finds that Defendants' discussion is not precluded by the magistrate judge's order. Plaintiff's motions for contempt will therefore be denied.

Plaintiff's motions for default judgment (Docket Nos. 166 and 169) seek default judgment as a remedy for Defendants' alleged violation of the magistrate judge's order. Accordingly, those motions will be denied as moot.

## IV.  CONCLUSION

For the foregoing reasons, this Court finds that Defendants are entitled to summary judgment in their favor. In addition, Plaintiff's motions for contempt and default judgment are denied.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 149) is GRANTED.

FURTHER, that Plaintiff's Motions for Contempt (Docket Nos. 164 and 167) are DENIED.

FURTHER, that Plaintiff's Motions for Default Judgment (Docket Nos. 166 and 169) are DENIED as moot.

FURTHER, that the Clerk of the Court shall close this case.

SO ORDERED.


Dated:   September 30, 2009
       Buffalo, New York

                                                   /s/William M. Skretny
                                                   WILLIAM M. SKRETNY
                                                 United States District Judge